May it please the Court, Sarah Bohr from Atlantic Beach, Florida, for the appellant, Kelly Mitchell. This case presents an important issue regarding whether the administrative law judge set forth the requisite specific and legitimate reasons for rejecting a consultative psychiatrist who indicated that the claimant, her ability, her stability was temporary and she would not be able to continue. Social Security rulings and regulations provide that one of the important functions of mental demands of unskilled work is how a person responds to work pressures, whether they respond appropriately to supervision, co-work situations. A couple of cases came out last year on unpublished decisions that are quite instructive. For example, in the court, either in writing or orally, that's our rule. I apologize. I thought that rule was amended. Oh, when did you think it was amended? I apologize. In any event, the Social Security rulings... Well, you're slightly wrong. They're not precedent. Our rules clearly say they're not precedent. I'm sorry, I can't hear you. Unpublished positions are not precedent, so... Yes. I understand that. The important point is that rulings and regulations by the Social Security Administration require that an individual be able to deal with work pressures, and Dr. Wong, who is a consultative psychiatrist, evaluated Ms. Mitchell and found that she was diagnosed with bipolar disorder, that her stability was only partial, and that it on any given day with additional stress, she was likely to be at risk of a gaffe as low as 40. That's a global assessment of functioning, which is quite low functioning. That her ability to relate to co-workers and the public, even at baseline, was moderately impaired and likely a few days a month would be of a severe impairment, and that with sustained exposure to workplace stress, her ability to relate to the public and co-workers was likely to become severely impaired, and that the probability of functional deterioration due to typical workplace stressors is very high. I'm sorry to get all of that. It seems to me the real issue here is whether the district, the magistrate judge or district court, whatever, properly took less weight of what Dr. Wong said because it was not a treating physician. And it seems to me that's the key issue that you have to deal with. We understand what Dr. Wong said, and the gaffe, I don't know where that ends up. Apparently from the briefs, some don't use it. But that isn't the real issue. The real issue is did the district court properly weigh Dr. Wong because he was not a treating physician? Well, in this case, there are no actual treating physician opinions, but there are evidence from the treating physicians. And one of the reasons the ALJ provided for rejecting Dr. Wong's opinion was the ALJ found that Ms. Mitchell's condition had improved. And the evidence from her treating providers does not support that. As we pointed out in our brief, several instances, this woman had hallucinations. The ALJ found she had hallucinations, that they would affect her ability to concentrate. That's a finding in the decision. For example, October of 2009, this was two months after Dr. Wong examined her. This is in her treating physician's records on mental status examination. She was, her effect was elevated. She was paranoid. She had auditory hallucinations. And she had limited insight. Her medications were adjusted. Two months after Dr. Wong saw her. A year later, in August of 2010, this is one year after Dr. Wong evaluated her. She was diagnosed with schizoaffective disorder, an impairment Dr. Wong noted had been present by history, but didn't find. He found bipolar disorder at that time of that examination. At that time, her mental status examination ---- I didn't follow your answer to Judge Wallace's question. There are no treating physicians ---- We understand that Dr. Wong said what he said. We do, we have read the record and we do understand what he said. And there's no doubt that if what he said had been accepted 100%, your client would have been found eligible. Or at least would have, you know, would have gone a long ways towards that. But here the ALJ and the district court gave less weight to Dr. Wong, discounted the testimony. The real issue is not what he said. The real issue is whether it was error for the trial fact to discount the testimony. That's what there is. And repeating what Dr. Wong says and telling us a number of times in depth what he said doesn't help that issue. I was discussing the treating ---- the question was asked was the district court did mention that the ALJ properly rejected Dr. Wong's opinion in favor of the treating psychiatrist's opinion. There are no specific medical source statements by a treating psychiatrist in the record. In other words, no ---- That's right. I mean, there's no ---- there's no ---- that is the case. But the fact that Dr. Wong is not a treating physician makes it easier to discount his testimony than if he was. So given that there is no treating physician, that Dr. Wong was not a treating physician, why was it error? You know, this is what we look for on appeal. We look for error in the way the judges below us treated his testimony. If you can persuade us that that was error, then, you know, you are going to go a long ways towards getting a reversal. But that's what you have to do. Yes. And I think that's what I understood Judge Wallace to be asking. And I was glad he asked it because I, too, am interested in the issue. And that's what I would like to hear the answer to. Well, you have to look at the reasons the judge gave for discrediting an opinion. While it may be easier to discredit an examining versus a treating, you still have to look for the reasons and whether they were specific and legitimate. The judge gave three reasons. He said that the psychiatrist examined her three months after she was released. She had an inpatient involuntary hospitalization for 11 days and that she was examined too close in time. And that, furthermore, he said that she improved after the Dr. Wong examined her. And we showed in our brief there were 17 instances when the GAF scores by the treating providers were lower than Dr. Wong's scores. So her condition did not improve. The judge said she improved. The record does not support that. The treating providers did not support an improvement in her condition. The GAF scores were less. She continued to have hallucinations. In fact, her diagnosis actually became schizoaffective disorder a year after Dr. Wong saw her, which was the diagnosis she had when she was hospitalized for 11 days in the involuntary hospitalization. So her condition clearly did not improve. It actually worsened. There were conflicting reports as to whether she was doing better or as bad. And the ALJ chose to believe the ones that said she was doing better after his discharge. We dispute that she was doing better. Another point that's very important is that there are only two opinions in the file. We have Dr. Wong. We have Dr. Loomis. Dr. Loomis is a state agency non-examining psychologist. And if you look at the records from Dr. Loomis, he they're on page 323 of the record. If you look at page 323 of the record, these are Dr. Loomis. And Dr. Loomis says at the bottom of this page, he reviewed the case, and then he says agreed with above, and then he says adopt CEMSS, adopt the consultative examiner's medical source statement. That's not what happened in this case. So there's a at the minimum there's an inconsistency. You have Dr. Loomis filling out paperwork that doesn't adopt the CE's medical source statement that's stated at the bottom of page 323. So you have an inconsistency that at a minimum should have been resolved. Another point I wanted to briefly mention is the very last paragraph, this is 90909, psych MC, that means psych medical consultant, reviewed. Because above that is a person named Charlie. A person named Charlie on August 31, 2009, writes a note to Dr. Loomis. This is internal notes within the agency. It appears NPSRT is appropriate. That means non-public simple repetitive tasks is appropriate. I'm sorry. You pointed me to the last paragraph. You said the last paragraph. Underneath that it says this is from the psych MC, reviewed, agree with the above, GAF-60, adopt CEMSS. That stands for consultative examiner medical source statement. If you look at Dr. Wong's report and look on the last page of his report, on page 227 to 228, it says functional ability slash medical source statement. What I read earlier was the findings he made in the medical source statement. That's a doctor's opinion about an individual's functioning. So you have the state agency doctor agreeing with the medical source statement, at least in the narrative here. It's not reflective in the findings that were made on the actual mental RFC assessment that was completed. If I may make a final point here, it's a very important point here, is that the ALJ found that this woman had moderate limitations of concentration, persistence, and pace. And the VE testified that with those limitations there was no work she could perform. She could not perform the three jobs the ALJ found. This is another important point. And we allege that the ALJ should have found, and his findings of moderate limitations of concentration, persistence, and pace should have been included in his hypothetical questioning and his findings of this case. I'd like to reserve my remaining time, if I might. You may proceed. May it please the Court, Henry Chi for Carolyn Colvin, Acting Commissioner of Social Security. The ALJ in this case correctly found that Klayman was not disabled because he reasonably had enough so that she could perform simple repetitive tasks with restricted contact with others. Now, with respect to Consultative Examiner Dr. Wong's opinion, the ALJ gave valid reasons for rejecting that opinion. The ALJ's reasons were that it was shortly after her episode in April 2009 where she was admitted into the hospital that her condition actually improved with treatment and that it was inconsistent with the other evidence in the record. What about the continuing, the low GAF scores, the continuing low GAF scores? The ALJ correctly did not consider those continually low GAF scores because those low GAF scores are simply unreliable. If you were to look at Plaintiff's opening brief on pages 19 and 20, she provides a really long citation to all the GAF scores that were lower than 60. But if you were to look at those actual records, it shows that those GAF scores do not really reflect a contemporaneous assessment of Klayman's mental condition. For example, Klayman cited to SIR 388, that's, I'm sorry, she cited the SIR 385, that's an October 14, 2009 treatment note with a GAF score of 54. But that treatment note simply reflected a phone call between the nurse and a Walgreens pharmacy. And that apparently received a GAF score of 54. The same is true for a Klayman site to SIR 424. This is a note reflecting that Klayman called and canceled her appointment. That apparently warranted a GAF score of 54. And in SIR 4— And who assigned these GAF scores? So presumably it would be the person that signed the form. But these GAF scores of 54 are printed on, I believe, the top right of all these pages, a GAF score of 54, 54, 54. And these GAF scores also don't account for instances after Dr. Wong's examination where Klayman actually improved. For example, we have an August 2009 report where Klayman said that she was feeling better with an increase in her medicine and that she felt 60 percent back to normal. Then we go to November 2009. She says she's doing better. She can ignore her voices. She denies confusion. Then she improves again. She's able to go to these group therapy sessions. And those notes are pretty positive. They say she's able to relate with others, that she's able to respond appropriately. And then finally in February 2010, she says that she feels better with medication changes. She's able to do her usual daily activities relatively better now. And I know that Klayman has pointed out some instances where she is complaining of paranoia, where she is complaining that she is hearing more voices. But the question here is, was the ALJ's review of these treatment records after Dr. Wong's examination, was his review of these records reasonable? Did he reasonably look at these records, ignoring the GAF scores, but just the notes, and conclude that these show that she improved with treatment and that she improved enough so that she could perform simple repetitive tasks and also have basically restricted access with others? Let me ask you something. You do a lot more cases than I do, so what I'm doing, if I'm incorrect, I'd like to know. But it looks like under the last part of the analysis, you have the burden to show what the jobs that this Klayman can do. And so you ask a question of a vocational expert based upon the residual functional capacity that's found by the administrative law judge to see if there's such jobs. Is that true? It was actually Klayman's attorney that asked that question. Well, in any event, it's your burden to show that the — that using the residual functional capacity, if there are jobs she can do, and that residual functional capacity is found on page 22, and then made more clear on page 59, as I look at it. And the question is, based upon the original statement of what the residual functional capacity was, the vocational expert found there were jobs that this person could perform. Is that true? I'm sorry. Based on the residual functional capacity with the additional limitation? No. Without it. Without — yes, there were jobs there. So that's how you carry your burden that this person could work, is that question and not answer, if there's such jobs. But if you take the limitation that the administrative law judge found, which was she had moderate difficulties with concentration, persistence, and pace, which is — we accept that that's true because he found that, then there are no jobs she can perform, according to the vocational expert. Correct? No, Your Honor. I disagree. Your — That's what the vocational expert said, that there's not any, if you include that limitation. That's a correct statement of the record, isn't it? Correct, Your Honor. But the ALJ did not actually adopt that limitation into his residual functional capacity finding. The ALJ did find that claimant was moderately limited in concentration, persistence, and pace, but he did that at steps two and three, which is a separate analysis from the residual functional — We do know that if you go to your burden to show there are jobs, which you have to show, that this person, according to this vocational expert, can't work because they have this limitation. So what you're saying is because the administrative law judge concluded that simple jobs could be done, that it doesn't make any difference that the vocational expert says this person can't work because we have to just adopt a bright-line rule as to what simple means. If I may just refine the ALJ's RFC finding. The ALJ's residual functional capacity finding was based on a report that found — Dr. Loomis's report that found that despite these moderate limitations in concentration, persistence, and pace, which the ALJ found in steps two and three regarding severity of impairment, claimant could still perform simple repetitive tasks. And thus — and that is in line with this Court's decision — Do you have page 60 of the ER? Just to focus in. So for Dr. Loomis's opinion? Do you have page 60 of the ER? I'm sorry? Are you on page 60? Yes, I'm on page 60. Okay, if you look at the bottom, there's a question and answer there. The last question before the last answer. Okay? So if using that same hypothetical, you add it to that limitation that there will be moderate limitations in concentration, persistence, and pace, would that preclude finding any jobs? And the answer is, I believe that will preclude, right? So what is the ALJ's finding with regard to moderate limitations in concentrations, persistence, and pace? The ALJ made that finding at steps two and three, and that's regarding how severe claimant's impairment — And what does he find, and where is that in the record? So that's at — It's page 22 at the top. Yes, at page 22 of his decision, he makes that finding. Thus, the claimant has moderate difficulties with concentration, persistence, and pace. But that finding is at steps two and three of his decision, where he's analyzing the severity of the impairment. After steps two and three, what the ALJ did was he translated that severe — that restriction, moderate limitation in concentration, persistence, and pace, into a residual functional capacity. You rely on an expert to show their jobs that she can do, right? Yes, Your Honor. And that expert, regardless of what the administrative logic says, says she can't do any job if she has this limitation. So how do you carry your burden that there are jobs she can do? You have to use the expert to do that. The ALJ did not adopt the V.E.'s testimony, because the ALJ did not agree that claimant's residual functional capacity should have included explicitly moderate limitations in concentration, persistence, and pace. What the ALJ did was — And where does he say that? The ALJ says that by adopting — adopting Dr. Loomis' opinion. And this is consistent — And where is that? Dr. Loomis' opinion is at SIR 307. No, no. No, no. Where does the ALJ do that? The ALJ adopts Dr. Loomis' opinion at page 25 of his decision. He kind of — towards the middle of the page, he talks about — There are only 10 pages to the decision. You mean 25 of the record? It's 25 of the supplemental experts of record. Okay. Which is page 8 of the decision. Okay. And where is that? Towards the middle, there's a paragraph that starts with Dr. Loomis. He discusses Dr. Loomis' opinion, and then says that he gives great weight to that opinion. And the reason — in adopting that opinion, the ALJ sufficiently addressed the moderate limitations because he agreed with Dr. Loomis' analysis that despite moderate limitations and concentration, persistence, and pace, claiming can do simple, repetitive tasks. And if you were to take a look — Just a minute. Didn't the administrative law judge — if you look at page 25, Dr. Loomis says she doesn't have problems with concentration, persistence, and pace. But the administrative law judge, in his findings, says she does. And — So, I mean, don't we take that finding, that he says she does? That — He's got the whole record, heard her testify. I looked at the other medical records, and he doesn't find that. He finds that she has that difficulty. And the distinction — Sorry. The distinction is that that is a finding as to the severity, and that was done in steps 2 and 3, where the ALJ was doing the psychiatric review technique. And if you were to look at Dr. Loomis' opinion, it would outline how this works. At page 307 of the SIR, Dr. Loomis is conducting the psychiatric review technique. And as part of that technique, he has to rate the functional limitations and the degree of the limitations. And Dr. Loomis does this at SIR 315. And at SIR 315, you'll see that Dr. Loomis found, as the ALJ did, that the degree, the severity of her mental impairment was that she was moderately limited in her ability to maintain concentration, persistence, and pace. And now this is steps 2 and 3. Now Dr. Loomis looks at these findings and says, OK, let me translate these into functional limitations. Let me tell the ALJ, how does this moderate limitation translate into what she can do at work? And Dr. Loomis does this. If you turn to page SIR 318 and 319, Dr. Loomis shows that this category of concentration, persistence, and pace is actually broken down into specific tasks that relate to what someone can do at work. And at 318, Dr. Loomis says, OK, she is moderately limited in concentration, persistence, and pace, but with regards to sustained concentration and persistence, Dr. Loomis finds that claiming to still carry out very short and simple instructions, but is moderately limited in his ability to carry out detailed instructions. And now taking those specific limitations, she then translates that into a residual functional capacity finding, which is that claiming can understand, remember, and carry out simple one- to two-step tasks. And that is exactly what the ALJ did in his decision. And how is that reconciled with the answer given by the vocational expert that says, no, on page 60, that says, that would preclude finding any jobs. I mean, he's the jobs expert, right? It's not the ALJ, it's not Dr. Loomis. I mean, Dr. Loomis can say all day long that she can do work, but if the vocational expert says, somebody with these limitations has no job she can find, how can you find that? I mean, she may have residual functional capacity, but if there are no jobs that can be done with her residual functional capacity, isn't she then precluded from working? Well, Your Honor, the ALJ was entitled not to adopt that portion of the V's testimony, and I would turn this Court's attention to Stubb Danielson. I'm sorry, a portion of whose testimony? The portion of the V's testimony where a claimant's attorney asked. You say V. Vocational expert. I see. So what we say is he rejected the answer of the vocational expert on page 60. Correct. And that's in line with this Court's decision in Stubb's Danielson. So then we need to have some other evidence in the records reporting that there are jobs that she can do. So we do away with the vocational expert, so we look for something else, somebody else who can tell us, oh, yes, there are plenty of jobs she can do. And where do we find that in the record? We find that in the ALJ's original hypothetical to the vocational expert with the original residual functional capacity. The original hypothetical based on the residual functional capacity finding where the vocational expert did identify three jobs that the claimant could perform. That is what the ALJ... But then the same vocational expert says, if you add this other limitation which you, the ALJ, have found she has, those jobs disappear. So what's left in the record to support the finding? Correct, Your Honor. The ALJ's decision here was based on rejecting that portion of the vocational experts. Yeah, I understood that the first time you said it. So he rejects that. And what's left? I mean, we still have to have somebody in the record saying, even with this limitation, she can still find a job. And I don't see anybody, you haven't pointed me to anybody, saying somebody with that limitation. Which the ALJ finds on the top of page 22, thus claiming has moderate difficulties with concentration, persistence, and pace, that somebody like that can still find a job. Somebody has to be out there saying that she can. And I'm looking for you to point to me who in the record says that. It was the vocational expert when he answered the ALJ's first hypothetical question that included, that mirrored the residual. That's your answer? You're sticking with it? That is my answer. Because the ALJ's RFC finding, the language of that, according to Stubbs Danielson, it adopts the moderate limitations to concentration, persistence, and pace. This Court has not required the ALJ to explicitly state that in the residual functional capacity. What this Court has held that as long as the ALJ's RFC finding, the residual functional capacity finding, is based on medical evidence, then that is substantial evidence. And with regards to concentration and attention, I do want to point out that the consultative examiner, Dr. Wong, he also found that she did not have any issues with concentration or attention. The same is true with Dr. Park, who was a treating physician. Throughout her notes, there are numerous notations where she did not have any issues with concentration and attention. Okay. And that's your answer. We'll have to accept it, right? If there are no further questions? I think you're out of time. All right. Thank you. We respectfully request that you affirm. You had some time left for rebuttal. Yes. Your Honor, I did want to mention that, as you've noted in the ALJ decision on page 22, the ALJ specifically acknowledged that Ms. Mitchell also experiences some auditory hallucinations which may interfere with her ability to concentrate. This is a very important finding that he made. And with that finding, as you've noted, the vocational expert testified that with moderate limitations of concentration, persistence, and pace, which comes from the, that there would be no, it would preclude the jobs that the ALJ had found. I also wanted to mention that there's no question this woman's condition waxed and waned. Mr. Choi says that the ALJ could reject that finding by the vocational expert, or that part of the vocational expert's testimony, saying that adding that limitation would preclude her from working, and rely on his more general statement earlier. What's your answer to that? Well, I think the ALJ made, perhaps you could say, conflicting findings, because one part of the opinion, his decision, which was not very long, he says she had moderate limitations of concentration, persistence, and pace. And then another part of the decision, in assessing the residual functional capacity, he didn't list any concentration limitations. And we cited in our brief, there have been numerous circuit, published circuit decisions from around the country, which have held that moderate limitations of concentration, persistence, and pace are not subsumed in a simple repetitive task. And I think the issue here is that after Dr. Loomis reviewed this file, even, the hallucinations were evident after that. So Dr. Loomis saw the file earlier in the case, and then we have additional medical records that have come in, and as I mentioned in my initial remarks, definitely show this woman has hallucinations, and she continued to have them a year after she was seen by Dr. Wan. This is consistent with the episodic nature of mental illness. And this court held in the Holohan case versus Mastanera, it's cited in our brief, that the fact that a person who suffers from severe mental impairment makes some improvement, does not mean that the person's impairments no longer seriously affect her ability to function in a workplace. The issue here is how she would function in a workplace. And Dr. Wan said that she would have great difficulty functioning in a workplace. And subsequent to his examination, the record does not show with her condition improved. It shows that even with treatment, with consistent treatment, she still continued to have some hallucinations. The Lester case, decided by this court, even occurrence of symptom-free periods and sporadic ability to work is not inconsistent with disability. And certainly, at a minimum, this court has long held that the opinion of a non-examining physician to the extent, the court's going to say, that's the finding that he adopted, Dr. Loftis' finding, as the commissioner argues, that that cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining or a treating physician, this was the holding in the Lester versus Chater case, as well as the Ryan versus Commissioner of Social Security cases. So here we have a situation where Dr. Wong's opinion is the only opinion by an examining physician. Dr. Loftis was not an examining physician. And as I pointed out earlier, there's an inconsistency in any event with his opinion. I want to briefly mention that the ALJ also failed to properly consider the lay evidence from Ms. Loftis. And the district court found that, yes, in fact, the ALJ's reasons were not valid here, but it was the harmless error. You're bringing this argument up in your rebuttal. You didn't bring it up earlier. It's in the briefs. Okay, that's fine. It's in the briefs. I'll rest on that. Do you have any other questions? Thank you. Okay, thank you.
judges: Wallace, Kozinski, Whaley